[No. E037909. Fourth Dist., Div. Two. Oct. 27, 2006.]

PARK CITY SERVICES, INC., Plaintiff and Respondent, v.
FORD MOTOR COMPANY, INC., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

## Counsel

Bowman and Brooke, Brian Takahashi and Robert S. Robinson for Defendant and Appellant.

Brennan, Wiener & Associates, Robert F. Brennan and Robert A. Wiener for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—The limousine in this case, while perhaps not up to the standards of Stephen King's Christine, certainly did seem to be possessed. Park City Services, Inc., doing business as Ferraro Limousine Services (Ferraro), leased it for use in its business in Dallas, Texas. The limousine was covered by an express limited warranty issued by Ford Motor Company, Inc. (Ford). However, despite the best repair efforts of a highly regarded Dallas Ford dealership, the rear suspension kept collapsing, the engine kept over-heating, and the air conditioner kept blowing hot air. The cooling fan would either stay on when it was not needed or fail to turn on when it was. Whenever the limousine was in for repairs, Ferraro lost income. Some breakdowns left Ferraro's customers stranded, often in sweltering summer heat. Ultimately, the limousine's engine simply burst into flames.

Ferraro filed this action against Ford, asserting a cause of action under the Song-Beverly Consumer Warranty Act (the Song-Beverly Act, or the Act) (Civ. Code, § 1790 et seq.) and a cause of action for breach of warranty. A jury awarded the full amount of damages Ferraro sought—$489,380.13, representing $163,126.71 in compensatory damages, trebled pursuant to the Song-Beverly Act. The trial court awarded an additional $198,198.48 in costs, including attorney fees, also pursuant to the Song-Beverly Act.

Ford appeals, contending:

1. Ferraro did not qualify for relief under the Song-Beverly Act because:

a. It never presented the limousine for repair in California.

b. At all relevant times, a 2000 amendment extending the Song-Beverly Act to vehicles used primarily for business purposes did not yet apply.

c. The Song-Beverly Act has never applied to a vehicle used primarily for business purposes when, as here, the buyer or lessee has not registered it or any other vehicles in California.

2. Ferraro was not entitled to recover consequential damages, because the warranty excluded them.

3. There was insufficient evidence to support certain items of damages that the jury awarded.

█ In the published portion of this opinion, we will hold that a vehicle is not within the scope of the Song-Beverly Act if (1) it is used primarily for

business purposes, (2) it is not registered in California, and (3) no other vehicles are registered to the plaintiff in California. Ferraro concedes that no vehicles have ever been registered to it in California. Accordingly, it cannot recover on a Song-Beverly Act theory. We need not address Ford's other contentions concerning the scope of the Song-Beverly Act.

In the unpublished portion of this opinion, we will hold that Ferraro was not entitled to recover consequential damages on a breach of warranty theory. Moreover, on this record, we cannot tell how much the jury would have awarded Ferraro on a breach of warranty theory if it had been told that it could not award consequential damages. Accordingly, we must reverse. We need not address the sufficiency of the evidence of the damages.

I

## FACTUAL BACKGROUND

Timothy and Teresa Ferraro lived in Dallas, Texas. Through their closely held Texas corporation, Park City Services, Inc., they operated a successful valet parking business. In 1997, they decided to have the corporation go into the limousine business, under the "d/b/a" name of Ferraro Limousine Services.

On October 28, 1997, Ferraro ordered a limousine from Tiffany Coachworks (Tiffany). Tiffany purchased a 1998 Lincoln Town Car and modified it into a "stretch" limousine. Federated Capital Services (Federated) then purchased the limousine and leased it back to Ferraro.

Because Tiffany was authorized by Ford to modify Ford vehicles, the limousine came with a Ford limited warranty good for three years or 100,000 miles. However, the warranty did not cover parts installed by Tiffany. One of the limitations in the warranty was that "Ford and your dealer are not responsible for any time that you lose, for any inconvenience that you might be caused, for the loss of your transportation, or for any other incidental or consequential damages you may have."

In January 1998, the Ferraros flew out to California, picked up the limousine, and drove it back to Dallas. Presumably Ferraro registered it in Texas. Ferraro concedes that it has never had any vehicle registered in California.

The limousine required repairs at least 25 times during the warranty period. Repeatedly, the engine would overheat; the air conditioner would blow hot air; and the relay switch for the cooling fan (which was crucial to both the

engine cooling system and the air conditioner) would either fuse together, so that the fan would keep running until the battery was dead, or blow out, so that the fan would not run at all. There were also repeated problems with the rear suspension and the electrical system. A handful of the repairs were attributable to Tiffany rather than Ford; however, these were largely cosmetic, involving such matters as a ripped vinyl top, a loose ceiling mirror, and leaking window gaskets. All of the repairs were done by the same authorized Ford dealership in Dallas (except the very first, which was done by a different authorized Ford dealership in Dallas).

Every time Ferraro had to take the limousine in for repair, it lost jobs it could otherwise have performed. Sometimes, the limousine would break down in the middle of a job, leaving Ferraro's clients stranded. On November 13, 2000, Ferraro, through its attorney, gave Ford notice that it was seeking repurchase and restitution under the Song-Beverly Act. Ford did not respond. After the warranty expired, in January 2001, the limousine continued to need frequent repairs, which Ferraro now had to pay for itself.

On September 10, 2002, a young man hired the limousine to serve as the setting for his proposal of marriage to his girlfriend. Mr. Ferraro picked the couple up at a park. The limousine "had champagne [and] roses and [was] decorated with rose petals." Once inside the limousine, the young man proposed, and the young lady accepted his proposal. Just as "they were hugging, flames started coming out of the hood."

All three occupants escaped unscathed. (A year later, Mr. Ferraro drove the couple to their wedding gratis.) The limousine, however, required extensive repair. Ferraro bought it from Federated for $2,500, then spent approximately $3,500 to put it back in working order. According to Ferraro's expert witness, the fire was caused by a defect in the electrical supply to the cooling fan—the same defect that had been causing all of the other overheating, air conditioning, and cooling fan problems.

II

THE LIMOUSINE AS A "NEW MOTOR VEHICLE"
WITHIN THE MEANING OF THE SONG-BEVERLY ACT

Ford contends Ferraro is not entitled to relief under the Song-Beverly Act, for three reasons. First, it argues that the Act requires the plaintiff to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" (Civ. Code, § 1793.2, subd. (c)), but Ferraro never brought the limousine to California for repairs. Second, it argues that an amendment in 2000, which made the Act applicable to motor vehicles used primarily for

business purposes, does not (or constitutionally cannot) apply here. Third, it argues that, even under the 2000 amendment, the Act has never applied to a vehicle used for business purposes if the business does not have any motor vehicles registered in California.

We agree with Ford's third contention. Accordingly, we do not discuss either of the first two.

### A. *Additional Factual and Procedural Background.*

Ford brought a motion in limine to bifurcate and try first, without a jury, "the issue of whether plaintiff's vehicle is eligible for Song-Beverly . . . relief . . . ." According to the motion, the limousine had been shipped to Texas, where Ferraro had used it "primarily" for business purposes. It had been registered in Texas and not in California. All warranty repairs had been performed in Texas; it had never been serviced in California.

Ferraro opposed the motion on procedural grounds, calling it "a summary adjudication motion in disguise." However, it also opposed it on the merits. It did not dispute any of Ford's asserted facts; it simply added that it had purchased the limousine in California and that it owned fewer than five vehicles, all registered in Texas.

The trial court granted the motion to bifurcate. However, it immediately proceeded to rule, without taking any additional evidence, that the Song-Beverly Act did apply.

After the trial, Ford filed both a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial, arguing in both that Ferraro was not entitled to relief under the Song-Beverly Act. The trial court denied both motions. It explained: "[I]nsofar as this court did not rule thereon when deciding defendant's motion to bifurcate . . . , defendant should have brought the issue of the applicability of Song-Beverly to these facts to the attention of the court and plaintiff in noticed and potentially dispositive motions before the eve of trial, and further should have requested instructions on the issue. It did neither. This court has no reason to change its previous ruling that the Act as it read on the date this complaint was filed is the law for this case."

### B. *Statutory Background.*

#### 1. *The Song-Beverly Act.*

The Legislature enacted the Song-Beverly Act in 1970. (Stats. 1970, ch. 1333, § 1, p. 2478.) In general, "[t]he [Song-Beverly] Act regulates

warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties. [Citations.] It supplements, rather than supersedes, the provisions of the California Uniform Commercial Code. [Citations.]" (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 213 [285 Cal.Rptr. 717].)

### a. *Definitions.*

The Act defines a "buyer" as "any individual who buys consumer goods from a person engaged in the business of manufacturing, distributing, or selling consumer goods at retail." (Civ. Code, § 1791, subd. (b).)

It defines a "manufacturer" as "any individual, partnership, corporation, association, or other legal relationship that manufactures, assembles, or produces consumer goods." (Civ. Code, § 1791, subd. (j).)

As originally enacted, the Act defined "consumer goods" so as to require that they be "used or bought for use primarily for personal, family, or household purposes." (Former Civ. Code, § 1791, subd. (a), added by Stats. 1970, ch. 1333, § 1, p. 2478.)

### b. *Manufacturer's Duty to Replace or Reimburse.*

█ In the event of a breach of an express warranty, the Song-Beverly Act requires a manufacturer to repair, replace, or reimburse the buyer for the nonconforming goods. Specifically, it provides:

"(c) The buyer shall deliver nonconforming goods to the manufacturer's service and repair facility within this state, unless, due to reasons of size and weight, or method of attachment, or method of installation, or nature of the nonconformity, delivery cannot reasonably be accomplished. If the buyer cannot return the nonconforming goods for any of these reasons, he or she shall notify the manufacturer . . . . Upon receipt of that notice of nonconformity, the manufacturer shall, at its option, service or repair the goods at the buyer's residence, or pick up the goods for service and repair, or arrange for transporting the goods to its service and repair facility. . . .

"(d)(1) [I]f the manufacturer . . . does not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that

amount directly attributable to use by the buyer prior to the discovery of the nonconformity." (Civ. Code, § 1793.2.)

### c. *Action for Breach of Warranty.*

Civil Code section 1794 governs civil actions under the Song-Beverly Act. It provides, as relevant here:

"(a) Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty . . . may bring an action for the recovery of damages and other legal and equitable relief.

"(b) The measure of the buyer's damages in an action under this section shall include . . . : [¶] . . . [¶]

"(2) Where the buyer has accepted the goods, Sections 2714[1] and 2715[2] of the Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform.

"(c) If the buyer establishes that the failure to comply was willful, the judgment may include . . . a civil penalty which shall not exceed two times the amount of actual damages. . . .

"(d) If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on

---

[1] California Uniform Commercial Code section 2714 provides:

"(1) Where the buyer has accepted goods and given notification . . . he or she may recover, as damages for any nonconformity of tender, the loss resulting in the ordinary course of events from the seller's breach as determined in any manner that is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a *proper case* any incidental and consequential damages under Section 2715 also may be recovered."

[2] California Uniform Commercial Code section 2715, as relevant here, provides:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include [¶] (a) [a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be *prevented by cover or otherwise* . . . ."

actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action. . . . "

### 2. *Amendments to the Song-Beverly Act.*

#### a. *Definition of "New Motor Vehicle."*

In 1982, the Song-Beverly Act was amended to clarify its application to motor vehicles. Among other things, the following definition of "new motor vehicle" was added: "[A] new motor vehicle which is used or bought for use primarily for personal, family, or household purposes . . . ." (Former Civ. Code, § 1793.2, subd. (e)(4)(B), as amended by Stats. 1982, ch. 388, § 1, p. 1720.)

#### b. *Application to Leases.*

In 1984, the Song-Beverly Act was amended again so as to apply to leases as well as sales. To this end, "consumer goods" were redefined as "any new product or part thereof that is used, bought, *or leased* for use primarily for personal, family, or household purposes . . . ." (Civ. Code, § 1791, subd. (a), as amended by Stats. 1984, ch. 1169, § 1, pp. 4003–4004, italics added.)

Also, the following provision was added: "The lessee of goods has the same rights under this chapter against the manufacturer . . . that the lessee would have had under this chapter if the goods had been purchased by the lessee, and the manufacturer . . . ha[s] the same duties and obligations under this chapter with respect to the goods that such manufacturer and other person would have had under this chapter if the goods had been sold to the lessee." (Civ. Code, § 1795.4, subd. (b), added by Stats. 1984, ch. 1169, § 2, p. 4005.)

#### c. *Specific Application to New Motor Vehicles.*

In 1987, the Song-Beverly Act was amended yet again by duplicating several of its provisions so as to make them apply specifically to motor vehicles. Thus, even though there was already a general provision concerning the manufacturer's duty to replace or reimburse, this specific provision was added: "If the manufacturer o[r] its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer . . . ." (Civ. Code, § 1793.2, subd. (d)(2), as amended by Stats. 1987, ch. 1280, § 2, p. 4557.)

Likewise, even though there was already a general provision concerning treble damages and attorney fees, this specific provision was added: "[I]f the buyer establishes a violation of [the foregoing provision], the buyer shall recover damages and reasonable attorney's fees and costs, and may recover a civil penalty of up to two times the amount of damages." (Civ. Code, § 1794, subd. (e)(1), as amended by Stats. 1987, ch. 1280, § 4, p. 4562.)

### 3. *The Tanner Act.*

In 1992, the Legislature spun off some of the provisions of the Song-Beverly Act dealing specifically with motor vehicles into a new section, entitled the Tanner Consumer Protection Act (the Tanner Act). (Civ. Code, § 1793.22, added by Stats. 1992, ch. 1232, § 7, pp. 5790–5793.) Hence, the existing definition of a "new motor vehicle"—"a new motor vehicle which is used or bought for use primarily for personal, family, or household purposes"—was moved from the Song-Beverly Act into the Tanner Act (former Civ. Code, § 1793.22, subd. (e)(2), added by Stats. 1992, ch. 1232, § 7, pp. 5790, 5793), and the Song-Beverly Act was amended to incorporate by reference this definition in the Tanner Act. (Civ. Code, § 1793.2, subd. (d)(2), as amended by Stats. 1992, ch. 1232, § 6, p. 5788.)

In 1998, the Legislature amended this definition so as to provide that " '[n]ew motor vehicle' means a new motor vehicle that is used or bought for use primarily for personal, family, or household purposes. 'New motor vehicle' also means a new motor vehicle that is bought or used *for business and personal, family, or household purposes* by a person, including a partnership, limited liability company, corporation, association, or any other legal entity, *to which not more than five motor vehicles are registered in this state.*" (Former Civ. Code, § 1793.22, subd. (e)(2), as amended by Stats. 1998, ch. 352, § 1, italics added.)

Finally, in 2000, the Legislature further amended this definition, so that it now provides: " 'New motor vehicle' means a new motor vehicle that is bought or used primarily for personal, family, or household purposes. 'New motor vehicle' also means a new motor vehicle with a gross vehicle weight under 10,000 pounds that is bought or used *primarily for business purposes* by a person, including a partnership, limited liability company, corporation, association, or any other legal entity, to which not more than five motor vehicles are registered in this state." (Civ. Code, § 1793.22, subd. (e)(2), as amended by Stats. 2000, ch. 679, § 1, italics added.)

### C. *Analysis.*

■ "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the

statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].)

The Song-Beverly Act was originally intended to protect individual consumers. Thus, prior to 1999, it applied only to "consumer goods"—including "new motor vehicles"—that were purchased or used "primarily for personal, family, or household purposes . . . ." (Civ. Code, §.1791, subd. (a); former Civ. Code, § 1793.2, subd. (e)(4)(B), as amended by Stats. 1982, ch. 388, § 1, p. 1720.)

Nevertheless, starting in 1999, the Legislature began to extend the Act to new motor vehicles used for business purposes—but only if "not more than five motor vehicles are registered in this state" to the purchaser or lessee. (Former Civ. Code, § 1793.22, subd. (e)(2), as amended by Stats. 1998, ch. 352, § 1; Civ. Code, § 1793.22, subd. (e)(2), as amended by Stats. 2000, ch. 679, § 1.) It allowed the purchaser or lessee to be any "person, including a partnership, limited liability company, corporation, association, or any other legal entity . . . ." (Civ. Code, § 1793.22, subd. (e)(2).)

Regrettably, the Legislature sought to bring about this essentially substantive change simply by amending a single definition; it failed to make other seemingly necessary changes. For example, "buyer" is still defined, in part, as an "individual who buys consumer goods . . . ." (Civ. Code, § 1791, subd. (b).) Consumer goods are still defined as goods purchased or leased "primarily for personal, family, or household purposes . . . ." (Civ. Code, § 1791, subd. (a).) And it is still only a "buyer" (or a lessee of "consumer goods") who has rights and remedies under the Act. (See Civ. Code, §§ 1790.1, 1793.2, subd. (d), 1794, 1795.4.)

█ We can avoid absurdity only by adding a gloss to the plain language of the statute. Thus, even though "buyer" is still defined as an *individual* purchaser of goods for *personal* use, it must be deemed to include *some corporate* purchasers of new motor vehicles for *business* use—namely, those to whom "not more than five motor vehicles are registered in this state."

Ferraro argues that we can at least follow the plain meaning of this last proviso: Ferraro has zero vehicles registered in California; zero is less than

five; and hence, Ferraro qualifies. The crucial proviso, however, is ambiguous. It could be construed to mean those to whom *at least one* motor vehicle is registered in this state, *but* not more than five motor vehicles. Moreover, we have already established that, when the Legislature extended the Song-Beverly Act to business vehicles, it was not necessarily writing with its sharpest pen. Accordingly, we look to the legislative history for guidance.

When the 1998 amendment was before it, the Legislature was repeatedly informed: "The author's intention . . . is to simply include small business vehicle purchases under the auspices of California's lemon law. Currently, small businesses are not included under the lemon law; only vehicles used primarily for personal, family, or household purposes. The author believes that small businesses should be afforded the same protections as individual consumers. . . . Finally, the author indicates that businesses with more than five vehicles have sufficient market strength that they do not necessarily need lemon law presumptions. *Businesses with five or fewer vehicles represent the vast majority of small businesses integral to California's economy.*" (Assem. Com. on Consumer Protection, 3d reading analysis of Assem. Bill No. 1848 (1997–1998 Reg. Sess.) p. 2, italics added;[3] accord, Assem. Com. on Consumer Protection, 3d reading analysis of Assem. Bill No. 1848 (1997–1998 Reg. Sess.), as amended May 7, 1998, p. 2;[4] Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1848 (1997–1998 Reg. Sess.) as amended June 11, 1998, pp. 1–2;[5] Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1848 (1997–1998 Reg. Sess.) as amended July 2, 1998, p. 3.[6])

The words, "not more than five motor vehicles are registered in this state," appear to have been modeled on Senate Bill No. 289, which had been introduced earlier in the same legislative session but did not pass. (See Sen. Bill No. 289 (1997–1998 Reg. Sess.) as introduced, § 1;[7] see also Sen. Bill No. 289 (1997–1998 Reg. Sess.) as amended June 8, 1998, § 3.[8]) The legislative history of Senate Bill No. 289 makes the intent of this language even more clear. It was meant to "expand[] the definition of new motor vehicle to include

---

[3] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/asm/ab_1801-1850/ab_1848_cfa_19980318_173709_asm_floor.html> (as of Oct. 27, 2006).

[4] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/asm/ab_1801-1850/ab_1848_cfa_19980508_172648_asm_floor.html> (as of Oct. 27, 2006).

[5] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/asm/ab_1801-1850/ab_1848_cfa_19980612_120514_sen_floor.html> (as of Oct. 27, 2006).

[6] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/asm/ab_1801-1850/ab_1848_cfa_19980708_153456_sen_floor.html> (as of Oct. 27, 2006).

[7] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/sen/sb_0251-0300/sb_289_bill_19970207_introduced.html> (as of Oct. 27, 2006).

[8] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/sen/sb_0251-0300/sb_289_bill_19980608_amended_asm.html> (as of Oct. 27, 2006).

vehicles used for commercial purposes, *up to a limit of five motor vehicles registered in California* to a person." (Assem. Com. on Consumer Protection, Analysis of Sen. Bill No. 289 (1997–1998 Reg. Sess.), as amended June 17, 1997, p. 7, italics added;[9] accord, Assem. Com. on Consumer Protection, Analysis of Sen. Bill No. 289 (1997–1998 Reg. Sess.), as amended June 8, 1998, p. 8.[10])

Finally, the 2000 amendment did not change the words, "to which not more than five motor vehicles are registered in this state." The legislative history of the 2000 amendment confirms that the Legislature understood this to require that a business must have at least one motor vehicle registered in California—perhaps even that *the subject vehicle itself* must be registered in California. For example, it describes the effect of the 1998 amendment as follows: "Up to five dual use vehicles per registered owner may assert the protection of the lemon law . . . ." (Sen. 3d reading of Sen. Bill No. 1718 (1999–2000 Reg. Sess.), as amended August 30, 2000, p. 1.[11])

The legislative history therefore indicates that the 1998 amendment was intended to protect *small businesses in California.* Moreover, as a mechanism for identifying these businesses, they were required to have *at least one*, but not more than five, motor vehicles registered in California. If we were to adopt Ferraro's contrary interpretation, then the Song-Beverly Act would protect any non-small, non-California businesses—even a business with thousands of vehicles—just as long as all of its vehicles were registered in other states. This would be completely contrary to the legislative intent.

We recognize that our interpretation does not rule out protection for *some* non-small, non-California businesses, provided they have just one to five vehicles registered in California. Still, such a business is a small business *in California,* no matter how many other vehicles it may have or how much business it may do in other states. Moreover, for the Song-Beverly Act to apply, the subject vehicle must at least have been bought or leased in California.[12] (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487–493 [30 Cal.Rptr.3d 823, 115 P.3d 98]; *Davis v. Newmar Corp.* (2006) 136 Cal.App.4th 275, 278 [38 Cal.Rptr.3d 690].) Accordingly, we believe our interpretation accords more closely with the legislative intent.

---

[9] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/sen/sb_0251-0300/sb_289_cfa_19970624_132954_asm_comm.html> (as of Oct. 27, 2006).

[10] Available at <http://www.leginfo.ca.gov/pub/97-98/bill/sen/sb_0251-0300/sb_289_cfa_19980629_102231_asm_comm.html> (as of Oct. 27, 2006).

[11] Available at <http://www.leginfo.ca.gov/pub/99-00/bill/sen/sb_1701-1750/sb_1718_cfa_20000907_113739_asm_floor.html> (as of Oct. 27, 2006).

[12] For purposes of this case, we need not decide whether the subject vehicle itself must be registered in California.

■ We therefore conclude that, because Ferraro leased and used the limousine primarily for business purposes, and because Ferraro has not registered any motor vehicles in California, it is not entitled to relief under the Song-Beverly Act.

D. *Waiver.*

Ferraro therefore strenuously contends that Ford somehow waived or otherwise forfeited any claim that the Song-Beverly Act did not apply. We find no such forfeiture.

Ferraro had the burden of pleading and proving that the Act applied. Its complaint did so allege; however, the complaint was unverified. Accordingly, Ford filed a general denial. This was sufficient to place the applicability of the Act in issue. (Code Civ. Proc., § 431.30, subd. (d); *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 383–384 [282 Cal.Rptr. 508].) Ford did not have to raise the issue in any kind of pretrial motion; it could choose simply to go to trial on it.

■ Ferraro argues, however, that several of the affirmative defenses alleged in Ford's answer invoked the Song-Beverly Act. For example, Ford alleged that Ferraro had failed to resort to a qualified third party dispute resolution process pursuant to the Act. (See Civ. Code, §§ 1793.22, subds. (c), (d), 1794, subd. (e)(2).) Ford also alleged that, *if* it was found liable under the Act, it would be entitled to a mileage offset under Civil Code section 1793.2, subdivision (d)(2)(C). However, " '[i]t is well settled in California that a defendant may plead as many inconsistent defenses in an answer as she may desire and that such defenses may not be considered as admissions against interest in the action in which the answer was filed. [Citations]' [Citations.]" (*Kerr Land & Timber Co. v. Emmerson* (1965) 233 Cal.App.2d 200, 228 [43 Cal.Rptr. 333], quoting *Jones v. Tierney-Sinclair* (1945) 71 Cal.App.2d 366, 373 [162 P.2d 669]; accord, *Burrow v. Carley* (1930) 210 Cal. 95, 103 [290 P. 577].)

Ferraro also argues that Ford never challenged the trial court's jurisdiction, never raised an issue of choice of law, never sought a change of venue, and never asserted forum non conveniens. Even if the Song-Beverly Act did not apply, however, the trial court had jurisdiction, the venue was proper, and forum non conveniens did not apply. Moreover, Ford is not arguing that California law should not be applied to these facts; quite the contrary, it is arguing that, under California law, Ferraro does not qualify for relief, and hence Ford is entitled to judgment. In the absence of any objection, the trial court could properly apply California law. (*Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581 [114 Cal.Rptr. 106, 522 P.2d 666].) Finally, Ferraro could

still properly proceed in California on its breach of warranty cause of action. Even assuming one or more of these procedural objections might have had merit, Ford was not required to raise any of them.

Next, Ferraro argues that Ford is estopped to assert that the Song-Beverly Act did not apply because Ferraro somehow relied on Ford's failure to make such an assertion earlier. Ford, however, asserted just that by filing a general denial. At that point, if Ferraro did "rely," its reliance was not justifiable. Moreover, Ferraro has failed to show any actual reliance. It argues that, if the Act does not apply, it is left without a remedy, because the Texas Lemon Law does not apply to a car purchased in California (see former Tex. Rev. Civ. Stat. Ann., art. 4413(36), § 6.07, subd. (a); see now Tex. Occ. Code Ann., § 2301.601, subd. (2)), and it has been held that the federal Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (15 U.S.C. § 2301 et seq.) does not apply to a leased car. (See *Parrot v. DaimlerChrysler Corp.* (2006) 212 Ariz. 255 [130 P.3d 530, 534]; *DiCintio v. DaimlerChrysler Corp.* (2002) 97 N.Y.2d 463, 470–474 [742 N.Y.S.2d 182, 768 N.E.2d 1121]; *Sellers v. Frank Griffin AMC Jeep, Inc.* (Fla.Dist.Ct.App. 1998) 526 So.2d 147, 156; *Alpiser v. Eagle Pontiac-GMC-Isuzu, Inc.* (1990) 97 N.C.App. 610, 614 [389 S.E.2d 293]; but see *Ryan v. American Honda* (2006) 186 N.J. 431, 434–435 [896 A.2d 454]; *O'Connor v. BMW of North America, LLC* (Fla.Dist.Ct.App. 2005) 905 So.2d 235, 238–240; *Mesa v. BMW of North America, LLC* (Fla.App. 2005) 904 So.2d 450, 453–456; *Peterson v. Volkswagen of America, Inc.* (2005) 2005 WI 61 [281 Wis.2d 39, 53–65, 697 N.W.2d 61]; *Voelker v. Porsche Cars North America, Inc.* (7th Cir. 2003) 353 F.3d 516, 522–525; *Dekelaita v. Nissan Motor Corp. in USA* (2003) 343 Ill.App.3d 801, 807–814 [799 N.E.2d 367, 278 Ill.Dec. 649].) Even if so, however, Ferraro was not deprived of a remedy because it relied on Ford; it never had a remedy in the first place.[13]

Ferraro claims, however, that the trial court made a finding that Ford was estopped. (It also claims that Ford waived any challenge to this finding by failing to raise it in its opening brief.) Not so. Rather, when the trial court denied Ford's motion for JNOV, which raised this issue, it explained:

---

[13] Obviously, Ferraro did have at least one remedy—an action for breach of warranty. Its real complaint is that it had no other way to recover treble damages and attorney fees. Even that, however, is not entirely true. Ferraro could have filed suit under the Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code, §§ 17.41–17.63) (DTPA). The DTPA allows the buyer or lessee of a new motor vehicle, whether for business or personal purposes, to recover treble damages and attorney fees for a breach of warranty. (Tex. Bus. & Com. Code, §§ 17.45, subds. (1), (4), 17.50, subds. (a)(2), (b), (d).)

We can only speculate as to why Ferraro did not proceed under the DTPA. We note, however, that there appears to be a substantial question as to whether the DTPA's two-year statute of limitations had expired, at least by the time Ferraro filed this action. (Tex. Bus. & Com. Code, § 17.565.)

"*[I]nsofar as this court did not rule thereon when deciding defendant's motion to bifurcate* . . . , defendant should have brought the issue of the applicability of Song-Beverly to these facts to the attention of the court and plaintiff in noticed and potentially dispositive motions before the eve of trial, and further should have requested instructions on the issue." (Italics added.) Ford, however, did raise this issue by way of its motion to bifurcate; the trial court could have denied the motion to bifurcate, forcing Ford to litigate the issue in a jury trial, but it chose instead to grant the motion to bifurcate and to rule on the Song-Beverly Act issue in that context. Ford is entitled to appellate review of that ruling.

At oral argument, Ferraro argued for the first time that it was handicapped because it had no opportunity to introduce evidence that might have been relevant to the applicability of the Act. There is some truth to this, because, when the trial court granted Ford's motion to bifurcate, it proceeded to rule on the issue (in favor of Ferraro) without an evidentiary hearing. However, in its opposition to Ford's motion, Ferraro had listed all of the facts that it wanted the trial court to consider; among other things, it conceded that it did not have any vehicles registered in California. Accordingly, it does not appear that Ferraro was prejudiced by the failure to hold an evidentiary hearing. Moreover, even assuming the failure to hold an evidentiary hearing was prejudicial error, Ferraro waived it by failing to cross-appeal or to raise it in its opening brief.

■ Finally, once the trial court had ruled against Ford, Ford did not have to raise the issue again. ". . . ' "An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible." ' [Citation.]" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212–213 [285 Cal.Rptr. 99, 814 P.2d 1341], quoting *People v. Calio* (1986) 42 Cal.3d 639, 643 [230 Cal.Rptr. 137, 724 P.2d 1162], quoting *Leibman v. Curtis* (1955) 138 Cal.App.2d 222, 225 [291 P.2d 542].) Thus, Ford quite properly acquiesced in the trial court's ruling. It could not request jury instructions on whether the Act applied, but it did request instructions on whether it had breached the Act; it also requested a mileage offset under the Act. Its acquiescence did not effect a forfeiture, because it had already done enough to preserve the issue for appeal.

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 295.

V

## DISPOSITION

The judgment is reversed. Ford is awarded costs on appeal against Ferraro.

Hollenhorst, Acting P. J., and McKinster, J., concurred.