[No. C064453. Third Dist. Sept. 6, 2011.]

DANIEL JOYCE, Plaintiff and Appellant, v.
FORD MOTOR COMPANY, Defendant and Respondent.

[CERTIFIED FOR PARTIAL PUBLICATION*]

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

## Counsel

Romano Stancroff & Mikhov, Steve Mikhov, Mark Romano; Rosner, Barry & Babbitt and Hallen D. Rosner for Plaintiff and Appellant.

Law Offices of Kevin J. Tully, Kevin J. Tully; Bowman and Brooke and Robert S. Robinson for Defendant and Respondent.

## Opinion

**HOCH, J.**—Daniel Joyce sued Ford Motor Company (Ford) for violation of the refund-or-replace provision of the Song-Beverly Consumer Warranty Act (Civ. Code, §§ 1790, 1793.2, subd. (d)(2); the Act), arising out of Joyce's purchase of a new 2005 Ford F-250 truck.[1] Ford moved for nonsuit at the close of Joyce's case-in-chief arguing that the truck fell outside the Act's protection because it was bought or used primarily for business purposes and had a gross vehicle weight rating of 10,000 pounds. Following a jury verdict in Joyce's favor, the trial court granted the motion and entered judgment in favor of Ford. The trial court also granted Ford's motion for directed verdict on the issue of civil penalties (§ 1794, subd. (c)), made following Ford's case-in-chief, which removed this issue from the jury's consideration.

On appeal, Joyce challenges both of these rulings. With respect to the motion for nonsuit, he argues (1) Ford's admission that the F-250 was a "new motor vehicle" within the meaning of the Act conclusively established the matter against Ford; (2) Ford did not properly disclose this as a potential defense in response to Joyce's discovery requests; and (3) sufficient evidence establishes that the F-250 qualifies as a "new motor vehicle" within the meaning of section 1793.22, subdivision (e)(2). With respect to the directed verdict motion, Joyce argues that substantial evidence supports a finding that Ford's failure to comply with the Act was "willful" within the meaning of section 1794, subdivision (c).

We conclude that the truck qualifies as a "new motor vehicle" within the meaning of the Act. We also conclude that Joyce submitted sufficient evidence of willful conduct to allow the jury to decide whether or not to award civil penalties. Accordingly, we reverse the judgment and remand the matter to the trial court with directions to reinstate the jury verdict and hold a new trial limited to the issue of civil penalties.

---

[1] Undesignated statutory references are to the Civil Code. While Joyce also sued Ford for breach of the implied warranty of merchantability (§ 1792), the jury found in favor of Ford on this claim, and Joyce does not take issue with this finding.

## BACKGROUND

In September 2005, Joyce bought a new Ford F-250 truck from Corning Ford Mercury Kia for $35,323.87. The truck had a three-year, 36,000-mile warranty. Joyce, a licensed contractor, had his own excavation business and bought the truck to serve as his "work truck." The truck weighed 6,787 pounds and had a gross vehicle weight rating of 10,000 pounds. Before the truck was delivered to Joyce, Corning Ford replaced a vacuum pump on the air-conditioning system to stop air from flowing out of the wrong vents.

In January 2006, Joyce received an emissions recall notice from Ford explaining that his new truck "may be releasing air pollutants which exceed California standards." The notice directed Joyce to return to the dealer to have the engine and transmission control modules reprogrammed with the latest software to enhance the performance of the fuel injection and onboard diagnostic systems, and to have the exhaust pressure sensor replaced.

The next month, Joyce brought the truck to another dealer, Novato Ford, for the recall service. Joyce was also concerned that his seatbelt would "lock up" when he tried to lean forward, the light under the hood appeared to have a short, and some screws had fallen out of the tailgate. Novato Ford performed the recall service, ordered a hood light switch and seatbelt retractor, and scheduled another service appointment to have these components replaced.

Following the recall service, Joyce immediately noticed a difference in the truck's performance. As he explained: "It didn't feel like the same truck. I hadn't had it that long, but I knew something wasn't right. . . . I would step on the gas, and there wasn't any real response." When Joyce called Novato Ford to complain, he was advised to wait until his next service appointment, and if the problem persisted, they would address it then.

About three weeks later, Novato Ford replaced the hood light switch and seatbelt retractor. The Ford emblem was also replaced. During the service appointment, Joyce told the technician about the truck's lack of power and acceleration. The technician explained that the reprogramming done to address the recall should not have affected the truck's performance. No other repairs were performed.

In March 2006, Joyce returned to Novato Ford with the same complaints. In the meantime, he had taken his family on a road trip to Southern California, and as he tried to pass another vehicle while climbing over the Tejon Pass, "the engine completely lost all the horsepower." Afraid that he was about to cause an accident, Joyce stepped on the gas pedal a couple

times, which caused the horsepower to return. However, throughout the trip, the truck remained "totally sluggish." As Joyce explained the situation to the service department at Novato Ford: "Something's wrong with my truck. I don't know what it is. Now my engine is cutting out. I don't have any—I don't have the acceleration. I don't have the horsepower. I don't have the torque. . . . Something's wrong. And now the engine is cutting out on me." Joyce also complained of a "popping" noise that sounded like "miniature backfires" coming from under the hood. Novato Ford replaced the VGT (variable geometry turbocharger) sensor, which did not remedy the situation.

A short time later, Joyce returned to Novato Ford. Instead of scheduling an appointment, Joyce went straight to the service technician who had replaced the VGT sensor, Mark Fox, and explained that the problems persisted. Fox did not have an answer, but advised Joyce to bring the truck in immediately after he experienced the loss of power. A couple weeks later, Joyce returned with the same complaints. This time, Fox took the truck for a test drive, concluded that the turbocharger needed to be replaced, and told Joyce to schedule an appointment. These unscheduled meetings with Fox were not documented.

In June 2006, Novato Ford replaced the turbocharger. This repair fixed the problem Joyce described as the engine "go[ing] completely flat," but the problems with horsepower and acceleration continued. Following the replacement, Joyce noticed an oil leak and brought the truck back to Novato Ford. Again, instead of scheduling an appointment, Joyce went straight to Fox, who assured him that the leak was "no big deal," but that he would fix it the next time the truck was there for a scheduled appointment. Joyce also told Fox that he continued to experience hesitation with respect to the truck's acceleration. Fox scanned the truck with his computer, but found nothing wrong.

About a month later, Joyce brought the truck in for another unscheduled visit with Fox. Fox again scanned the truck with his computer. But this time, he found and performed two updates on the vehicle. After these updates, the truck "ran a little bit better" and regained some of its horsepower. Joyce returned about four months later because the updates did not fix the hesitation problem. Fox was unable to locate any updates to perform on the truck. These unscheduled meetings with Fox also went undocumented.

In May 2007, Joyce returned to Novato Ford, this time because the truck's "check engine" light was on. He scheduled an appointment and informed the service advisor that he was still experiencing the hesitation problem and also wanted to have the oil leaks fixed. Novato Ford performed an update on the PCM module (powertrain control module), which caused the "check engine" light to go out, but did nothing to address Joyce's other concerns.

In February 2008, Joyce brought his truck to Novato Ford and complained that his limited slip differential was not working. A limited slip differential "essentially helps provide traction when one wheel starts to spin or take off." Joyce first noticed a problem with the differential when he was trying to drive up a fire road on his way to a jobsite and the truck became stuck in the mud. After a couple of unsuccessful attempts to drive out of the mud, Joyce engaged the truck's four-wheel drive and was able to reach the jobsite. He did not think much of the situation until the owner of the company who had hired him arrived at the jobsite in a Porsche. According to Joyce, between this incident and the February 2008 service appointment, he brought the truck to Novato Ford "[a]t least a dozen" times. But because he neither scheduled an appointment nor talked to a service advisor, these visits also went undocumented.

During the service appointment, the technicians performed a series of tests and found nothing wrong with the differential. The service manager, Joe Galileo, then e-mailed Ford's field service engineer, who referred him to the technical hotline. Following this phone call, the technicians performed another test on the truck, which also revealed no problems with the differential. Not satisfied, Joyce returned home and performed his own test on the truck, placing a block under the axle so that one rear tire was on the ground and the other rear tire was an inch off of the ground. When he tried to drive off of the block, the elevated tire simply spun while the other tire remained motionless. Joyce then returned to Novato Ford and convinced Galileo to perform the same test. After making some phone calls and consulting the shop manual, the technicians were able to get the truck to drive off of the block by briefly engaging the parking brake. Galileo then explained to Joyce that according to the shop manual, when the vehicle is on an "excessively slippery surface," slight application of the parking brake would help the clutches within the differential to engage, which would enable him to get out of the situation.

Still not satisfied, Joyce called Ford's customer service number and complained about the differential and Novato Ford's handling of the situation. After a 40-minute conversation, the voice on the other end of the line explained that there was nothing he could do for Joyce, except register the complaint with Ford. At this point, Joyce threatened to file a lawsuit if Ford refused to repair his vehicle and stated: "You guys either fix it or give me my money back." The record of this phone call lists the issue as closed and states that Ford agreed with Novato Ford's conclusion that the differential worked properly.

*The Litigation*

In May 2008, Joyce filed this lawsuit against Ford. As already indicated, Joyce alleged that Ford violated section 1793.2, subdivision (d)(2), by failing

to either replace his F-250 truck or make restitution following Ford's inability to repair the vehicle to conform to the express warranty after a reasonable number of attempts. The matter was twice tried before a jury. In the first trial, the jury rendered a verdict for Joyce in the amount of $510,000 ($210,000 in actual damages, plus $300,000 in civil penalties). Because the jury improperly awarded $175,000 in actual damages based on its estimation of the hourly rate charged by Joyce's attorneys, the trial court ordered a new trial on both liability and damages.

The facts adduced during the second trial are those described above, with the following additions. During trial, Joyce's expert testified that his inspection of the vehicle revealed significant hesitation with respect to acceleration, the transmission did not work properly, the limited slip differential was defective, and the vehicle had some oil leaks. Ford's expert testified that the vehicle experienced a normal amount of "turbo lag," which he described as a brief "lag time" before the engine "ramps up," but explained that this is common to all diesel engines. He found no abnormal hesitation with respect to acceleration, no transmission shifting errors, and no problems with the limited slip differential. He also found that the truck had "plenty of power" and "operated fine." Ford's expert did confirm the oil leaks, but testified that these leaks were repairable.

Ford moved for nonsuit at the close of Joyce's case-in-chief, arguing that the truck was not a "new motor vehicle" within the meaning of section 1793.22, subdivision (e)(2), and therefore fell outside the protection of the Act's refund-or-replace provision. (§ 1793.2, subd. (d)(2).) This was so, argued Ford, because the truck was bought or used primarily for business purposes and had a gross vehicle weight rating of 10,000 pounds. Joyce responded by arguing that Ford admitted, in response to a pretrial request for admissions, that the truck was a "new motor vehicle" within the meaning of the Act, that Ford did not properly disclose this as a potential defense in response to Joyce's discovery requests, and that substantial evidence supported a jury finding that the truck qualified as a "new motor vehicle," either because it was "bought or used primarily for personal, family, or household purposes," or because it was "bought or used primarily for business purposes" and had "a gross vehicle weight under 10,000 pounds." (§ 1793.22, subd. (e)(2).) The trial court deferred ruling on the motion and allowed Ford to go ahead with its defense.

At the close of the defense case-in-chief, Ford moved for a directed verdict on the issue of civil penalties under section 1794, subdivision (c), arguing that Joyce presented no substantial evidence to support a jury finding that Ford willfully violated the refund-or-replace provision. Specifically, Ford argued that there was "no evidence of sufficient substantiality to show . . .

that Ford was other than reasonable and in good faith in believing that the truck had been repaired to match the Ford warranty after reasonable opportunities to repair." In response, Joyce argued that the jury could reasonably conclude Ford's violation of the refund-or-replace provision was willful because he personally informed Ford about the problems with the differential, threatened to file a lawsuit if Ford did not repair the truck, and Ford had access to the vehicle's warranty history, which would have revealed the other problems he had with the truck. The trial court granted the directed verdict motion, stating: "As I see the evidence, if there is a defect or defective vehicle claim proven in this case, it wasn't because Ford intentionally failed to try to do something. It would be incompetence, not intentional."

The jury returned a verdict in Joyce's favor in the amount of $35,323.87. The trial court then granted the motion for nonsuit and entered judgment in favor of Ford, ruling as a matter of law that the truck was not a "new motor vehicle" within the meaning of the Act. This appeal followed.

## DISCUSSION

### I

*Song-Beverly Consumer Warranty Act*

██ Enacted in 1970, the Act "regulates warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties. [Citations.] It supplements, rather than supersedes, the provisions of the California Uniform Commercial Code. [Citations.]" (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 213 [285 Cal.Rptr. 717]; see *Park City Services, Inc. v. Ford Motor Co., Inc.* (2006) 144 Cal.App.4th 295, 301–302 [50 Cal.Rptr.3d 373]; Stats. 1970, ch. 1333, § 1, p. 2478.) "[T]he Act is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184 [28 Cal.Rptr.2d 371].)

The refund-or-replace provision states in relevant part: "If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle, as that term is defined in paragraph (2) of subdivision (e) of Section 1793.22, to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new

motor vehicle in accordance with subparagraph (A)[2] or promptly make restitution to the buyer in accordance with subparagraph (B).[3] However, the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle." (§ 1793.2, subd. (d)(2).)

Section 1793.22, subdivision (e)(2), defines "new motor vehicle." As relevant here, it provides: " 'New motor vehicle' means a new motor vehicle that is bought or used primarily for personal, family, or household purposes. 'New motor vehicle' also means a new motor vehicle with a *gross vehicle weight* under 10,000 pounds that is bought or used primarily for business purposes by a person, including a partnership, limited liability company, corporation, association, or any other legal entity, to which not more than five motor vehicles are registered in this state." (Italics added.)

Section 1794 governs civil actions under the Act and provides in relevant part: "(a) Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief. [¶] (b) The measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2 . . . . [¶] . . . [¶] (c) If the buyer establishes that the failure to comply was willful, the judgment may include, in addition to the amounts recovered under subdivision (a), a civil penalty which shall not exceed two times the amount of actual damages."

Thus, if Joyce's F-250 was a "new motor vehicle" within the meaning of the Act, and Ford was unable to service or repair the truck to conform to the express warranty after a reasonable number of attempts, then Joyce was

---

[2] Section 1793.2, subdivision (d)(2)(A) provides: "In the case of replacement, the manufacturer shall replace the buyer's vehicle with a new motor vehicle substantially identical to the vehicle replaced. The replacement vehicle shall be accompanied by all express and implied warranties that normally accompany new motor vehicles of that specific kind. The manufacturer also shall pay for, or to, the buyer the amount of any sales or use tax, license fees, registration fees, and other official fees which the buyer is obligated to pay in connection with the replacement, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer."

[3] Section 1793.2, subdivision (d)(2)(B) provides: "In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer."

entitled to replacement of the vehicle or restitution of the purchase price, along with consequential and incidental damages. And if Ford's violation of the statute was willful, then Joyce was also entitled to civil penalties. With this overview in mind, we turn to Joyce's contentions on appeal.

## II

### *Grant of Nonsuit*

Joyce contends that the trial court improperly granted Ford's motion for nonsuit because (1) Ford's admission that the F-250 was a "new motor vehicle" within the meaning of the Act conclusively established the matter against Ford, (2) Ford did not properly disclose this as a potential defense in response to Joyce's discovery requests, and (3) sufficient evidence establishes that the truck qualifies as a "new motor vehicle" within the meaning of the Act. We conclude, based on Ford's admission and undisputed evidence, that the truck qualifies as a "new motor vehicle" within the meaning of section 1793.22, subdivision (e)(2).

"A nonsuit is proper only if there is no substantial evidence to support a jury verdict in the plaintiff's favor. In determining whether the plaintiff's evidence is sufficient, the court may not weigh the evidence or determine the credibility of witnesses. The evidence favorable to the plaintiff must be accepted as true and any conflicting evidence disregarded. If facts sufficient to support a verdict in the plaintiff's favor may logically and reasonably be inferred from the evidence, the motion must be denied even if the evidence is also susceptible to conflicting inferences. Nonsuit may be granted only if there is no substantial evidence upon which reasonable minds could differ. [Citations.]" (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 58 [29 Cal.Rptr.2d 615]; see *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838–839 [206 Cal.Rptr. 136, 686 P.2d 656].)

### *Ford's Admission the F-250 Is a "New Motor Vehicle"*

Code of Civil Procedure section 2033.010 allows any party to a civil action to obtain discovery "by a written request that any other party to the action admit . . . the truth of specified matters of fact, opinion relating to fact, *or application of law to fact*." (Italics added.) Thus, "when a party is served with a request for admission concerning a legal question properly raised in the pleadings he cannot object simply by asserting that the request calls for a conclusion of law. He should make the admission if he is able to do so and does not in good faith intend to contest the issue at trial, thereby 'setting at rest a triable issue.' [Citation.] Otherwise he should set forth in detail the reasons why he cannot truthfully admit or deny the request. [Citation.]"

(*Burke v. Superior Court* (1969) 71 Cal.2d 276, 282 [78 Cal.Rptr. 481, 455 P.2d 409]; see *Cembrook v. Superior Court* (1961) 56 Cal.2d 423, 429 [15 Cal.Rptr. 127, 364 P.2d 303].) "Any matter admitted in response to a request for admission is *conclusively established* against the party making the admission . . . unless the court has permitted withdrawal or amendment of that admission under [Code of Civil Procedure section] 2033.300."[4] (Code Civ. Proc., § 2033.410, subd. (a), italics added; see also *Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 259–260 [78 Cal.Rptr.3d 738] [city conclusively admitted police officer was not exempt from liability pursuant to Veh. Code, § 21055].)

Here, in response to a pretrial request for admissions, Ford admitted "that the [subject vehicle] is a 'new motor vehicle' under Civil Code Section 1793.22[, subdivision] (e)(2)." Ford did not move the trial court to allow the withdrawal or amendment of this admission. Accordingly, the matter is conclusively established against Ford. This is so regardless of the fact that Ford prefaced its responses to the request for admissions with a general objection that it had not "completed its investigation of the facts," and that the responses were prepared "on the basis of information presently available to and located by [Ford] upon reasonable investigation." If Ford lacked sufficient information or knowledge to admit or deny whether the truck qualified as a "new motor vehicle" under the Act, then it should have stated as much in response to that specific request for admission. (See Code Civ. Proc., §§ 2033.210, 2033.220.) Ford cites no authority, nor have we found any, establishing that an unqualified "Admit" given in response to a specific admission request can be negated by prefacing the entire document with a general disclaimer that the investigation was ongoing.

Nor was Joyce required to seek an order compelling further responses to his request for admissions. He received the response he was looking for: "Admit." Indeed, it was Ford that should have moved the trial court to allow it to withdraw or amend this response prior to moving for nonsuit on a matter conclusively established against it. (Code Civ. Proc., §§ 2033.300, 2033.410.) Such a motion would have been granted as long as the trial court determined that Ford's mistake in admitting the matter was not clearly inexcusable and withdrawal would not substantially prejudice Joyce. (See *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1408 [86 Cal.Rptr.3d 457].) However, as we explain immediately below, even if Ford had properly withdrawn its admission prior to moving for nonsuit, this would not have

---

[4] "A party may withdraw or amend an admission . . . only on leave of court granted after notice to all parties." (Code Civ. Proc., § 2033.300, subd. (a).) And the trial court may permit withdrawal or amendment of an admission "if it determines that the admission was the result of mistake, inadvertence, or excusable neglect, and that the party who obtained the admission will not be substantially prejudiced in maintaining that party's action or defense on the merits." (Code Civ. Proc., § 2033.300, subd. (b).)

altered the undisputed evidence establishing the truck to be a "new motor vehicle" within the meaning of the Act.

### Undisputed Evidence the F-250 Is a "New Motor Vehicle"

■ As a preliminary matter, we agree with Ford that Joyce provided no substantial evidence the truck was "bought or used primarily for personal, family, or household purposes." Despite the fact that someone checked this box on the installment sale contract, Joyce's own testimony established beyond any legitimate dispute that the truck was "bought or used primarily for business purposes." (§ 1793.22, subd. (e)(2).) Indeed, when Ford's trial counsel asked whether he bought the truck "for business use," Joyce responded: "Yes." Joyce also repeatedly referred to the vehicle as his "work truck" and explained that he bought the truck because he "wanted something [he] could count on for work." Accordingly, in order for the truck to qualify as a "new motor vehicle" within the meaning of the Act, it must have a "gross vehicle weight under 10,000 pounds." (§ 1793.22, subd. (e)(2).)

Ford does not dispute that the F-250 actually weighs less than 10,000 pounds. The invoice states that the truck's shipping weight was 6,787 pounds. Joyce added a diesel fuel tank to the back of the truck, which weighed about 700 pounds when full. Joyce also added a rack to hold pipe, an isolator to provide an additional power source, and a back-up camera. However, Ford does not contend that these additions brought the vehicle's weight to 10,000 pounds. Instead, Ford argues that when the Legislature drafted section 1793.22, subdivision (e)(2), the phrase "gross vehicle weight" was intended to mean "gross vehicle weight rating." And because the F-250 had a gross vehicle weight rating of 10,000 pounds, it does not qualify as a "new motor vehicle" within the meaning of the Act. We are not persuaded.

■ Issues of statutory interpretation are questions of law subject to de novo review. (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492 [35 Cal.Rptr.3d 596].) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676,

101 P.3d 563]; see *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831 [95 Cal.Rptr.3d 164, 209 P.3d 73]; *Park City Services, Inc. v. Ford Motor Co., Inc., supra,* 144 Cal.App.4th at pp. 305–306.)

■ We agree with Joyce that the phrase "gross vehicle weight" is clear and unambiguous. To determine the plain meaning of statutory language, courts often look to dictionaries. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 302 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 592 [84 Cal.Rptr.3d 285].) Merriam-Webster's Collegiate Dictionary, 11th edition, defines the word "weight" to mean "the amount that a thing weighs." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1419, col. 1.) This dictionary also defines "gross" to mean "overall total exclusive of deductions." (*Merriam-Webster's, supra,* at p. 513, col. 2.) ■ Accordingly, the plain and ordinary meaning of "gross vehicle weight" is the overall total amount that the vehicle weighs. And there is no dispute that the F-250 in this case weighs less than 10,000 pounds.

Despite the plain meaning, Ford would have us read the word "rating" into the statute. According to Ford, because " 'gross vehicle weight' is not defined in the statute or universally applied," we must refer to the legislative history,[5] which "clearly shows that 'gross vehicle weight' was understood to mean the vehicle's 'weight rating.' " However, as the F-250's owner's manual states, the "GVW (Gross Vehicle Weight)" means "the Vehicle Curb Weight + cargo + passengers." The owner's manual also defines the "GVWR (Gross Vehicle Weight Rating)" to mean "the maximum allowable weight of the fully loaded vehicle (including all options, equipment, passengers and cargo)." Thus, Ford understood there to be a difference between a vehicle's gross vehicle weight and gross vehicle weight rating. This understanding was shared by other

---

[5] Ford has requested that we take judicial notice of certain portions of the legislative history of Senate Bill No. 1718 (1999–2000 Reg. Sess.) (Senate Bill 1718) (enacted as Stats. 2000, ch. 679, § 1, pp. 4508, 4510), which amended section 1793.22, subdivision (e)(2), to include the phrase "gross vehicle weight under 10,000 pounds." Joyce has done the same, although he requests that we take judicial notice of a larger portion of the legislative history. We grant both of these requests. (Evid. Code, § 452, subd. (c).) We deny Ford's request to take judicial notice of a portion of a certain law firm's Web site, which offers that firm's interpretation of the statute. We grant Joyce's request to take judicial notice of portions of various owner's manuals which provide a definition of "gross vehicle weight" and "gross vehicle weight rating" because these materials are relevant to determining the true meaning of these phrases as used in the automotive industry. (Evid. Code, § 451, subd. (e) ["true signification of all English words and phrases and of all legal expressions" must be judicially noticed]; see also *Irvine v. J. F. Shea Company, Inc.* (1940) 41 Cal.App.2d 458, 459–460 [107 P.2d 80] [judicial notice of industry meaning of "spreader-board or cross brace"]; *Hines v. Miller* (1898) 122 Cal. 517, 519 [55 P. 401].) Finally, we also grant Joyce's request to take judicial notice of part 393.52 of title 49 of the Code of Federal Regulations (2010). (Evid. Code, § 452, subd. (b).)

manufacturers in the industry. Indeed, other truck manufacturers do not use the term "GVW (Gross Vehicle Weight)" to describe the maximum allowable weight of the vehicle, as Ford would have us read into the statute.[6] Also, the federal Department of Transportation defines "[t]he terms 'GVWR' and 'GVW' [to] refer to the manufacturer's gross vehicle weight rating and the actual gross vehicle weight, respectively" in its safety regulations relating to brake performance. (49 C.F.R. § 393.52(e) (2010).) This undercuts Ford's assertion that the term "gross vehicle weight" is not universally understood or applied in the industry. It is. And it does not mean "gross vehicle weight rating."

Nor does the legislative history reveal that the Legislature intended the phrase "gross vehicle weight" to mean "gross vehicle weight rating." Ford relies on the Governor's press release announcing his signing of Senate Bill 1718 and a revised enrolled bill report drafted by the State and Consumer Services Agency. Each of these documents states that the bill "expands Lemon Law protections to those vehicles with a *manufacturer's weight rating* of less than 10,000 pounds." (Governor's Press Release (Sept. 26, 2000); State and Consumer Services Agency, Rev. Enrolled Bill Rep. on Senate Bill 1718 (1999–2000 Reg. Sess.) prepared for Governor Davis (Sept. 13, 2000) p. 1, italics added.)

█    While we are bound to take judicial notice of the enrolled bill report (see *Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19 [22 Cal.Rptr.3d 530, 102 P.3d 915]), we do so with the understanding that "enrolled bill reports cannot reflect the intent of the Legislature because they are prepared by the executive branch, and then not until after the bill has passed the Legislature and has become 'enrolled.' Moreover, to permit consideration of enrolled bill reports as cognizable legislative history gives the executive branch an

---

[6] Chevrolet's 2011 Silverado owner's manual states: "Gross Vehicle Weight (GVW) includes the curb weight of the vehicle, any cargo carried in it, and the people who will be riding in the vehicle as well as trailer tongue weight." Nissan's 2010 Titan owner's manual states: "GVW (Gross Vehicle Weight)—curb weight plus the combined weight of passengers and cargo." GMC's 2009 Sierra owner's manual states: "The Gross Vehicle Weight (GVW) includes the curb weight of the vehicle, any cargo carried in it, and the people who will be riding in the vehicle." Lincoln's 2010 Navigator owner's manual states: "GVW (Gross Vehicle Weight)—is the Vehicle Curb Weight + cargo + passengers." Pontiac's 2009 Torrent owner's manual states: "The Gross Vehicle Weight (GVW) includes the curb weight of the vehicle, any cargo carried in it, and the people who will be riding in the vehicle." Mazda's 2010 Mazda3 owner's manual states: "GVW (Gross Vehicle Weight) is the Vehicle Curb Weight + cargo + passengers." Mercury's 2010 Mountaineer owner's manual states: "GVW (Gross Vehicle Weight)—is the Vehicle Curb Weight + cargo + passengers." Buick's 2010 Enclave owner's manual states: "The Gross Vehicle Weight (GVW) includes the curb weight of the vehicle, any cargo carried in it, and the people who will be riding in the vehicle." Cadillac's 2010 Escalade owner's manual states: "The Gross Vehicle Weight (GVW) includes the curb weight of the vehicle, any cargo carried in it, and the people who will be riding in the vehicle."

unwarranted opportunity to determine the meaning of statutes. That is the proper and exclusive duty of the judicial branch of government." (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 42 [34 Cal.Rptr.3d 520].) We also take judicial notice of the Governor's press release. (See *People v. Tanner* (1979) 24 Cal.3d 514, 520 [156 Cal.Rptr. 450, 596 P.2d 328]; contra, *Benson v. Workers' Comp. Appeals Bd.* (2009) 170 Cal.App.4th 1535, 1554, fn. 16 [89 Cal.Rptr.3d 166].) However, while we do so, we similarly conclude that this announcement cannot reflect the intent of the Legislature, and is therefore not cognizable legislative history.

The actual legislative history cuts against Ford's position that the Legislature meant "weight rating" when it used the word "weight." The third reading analysis states that the bill, as amended August 25, 2000, was intended to bring "within the scope of the lemon law new motor vehicles bought or used primarily for business purposes *weighing* less than 10,000 pounds." (Sen. Com. on Consumer Protection, 3d reading analysis of Senate Bill 1718 (1999–2000 Reg. Sess.) as amended Aug. 25, 2000, p. 1, italics added.) The Senate Rules Committee's analysis of the bill confirms that the bill, as amended August 30, 2000, "revises the definition of a new motor vehicle to include only a new motor vehicle with a *gross vehicle weight* under 10,000 pounds bought or used primarily for business purposes, as specified." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Senate Bill 1718 (1999–2000 Reg. Sess.) as amended Aug. 30, 2000, p. 1, italics added; see also Sen. Com. on Consumer Protection, 3d reading analysis of Senate Bill 1718 (1999–2000 Reg. Sess.) as amended Aug. 25, 2000, p. 1 ["new motor vehicles bought or used primarily for business purposes *weighing* less than 10,000 pounds" (italics added)].) We have found no committee report or bill analysis informing the legislators who voted on the bill that "gross vehicle weight" meant the maximum allowable weight of the vehicle as opposed to the actual weight of the vehicle.

Because there is no dispute that the truck actually weighed less than 10,000 pounds, the trial court erred in granting Ford's motion for nonsuit.

### III

#### *Directed Verdict**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1478.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to reinstate the jury verdict and hold a new trial limited to the issue of civil penalties. Ford Motor Company shall reimburse Daniel Joyce for his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Hull, Acting P. J., and Butz, J., concurred.