IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 10, 2013 Session

## ROBERT BEAVER v. FORD MOTOR COMPANY

**Direct Appeal from the Chancery Court for Coffee County**
**No. 2011-CV-265     Vanessa A. Jackson, Chancellor**

**No. M2012-02088-COA-R3-CV - Filed July 31, 2013**

In this appeal we are asked to construe the scope of the Tennessee Lemon Law and to determine whether it applies to Plaintiff's vehicle. For the following reasons, we find the law applicable to vehicles with a "gross vehicle weight" of 10,000 pounds or less, and we affirm the trial court's conclusions that Plaintiff is entitled to protection and relief thereunder.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

James H. Drescher, Brentwood, Tennessee, for the appellant, Ford Motor Company

Charles Craig Northcott, Tullahoma, Tennessee, for the appellee, Robert Beaver

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

In May of 2010, Robert Beaver purchased a 2011 Ford F-350 Super Duty Crew-Cab diesel truck from Kidd Ford-Lincoln-Mercury in McMinnville, Tennessee, for $58,438.59. After he purchased the vehicle, Mr. Beaver had a trailer kit, a bedliner and vent covers installed on the vehicle and he had the vehicle's windows tinted.

According to Mr. Beaver, he began experiencing problems with the vehicle immediately after the purchase. Primarily, he claims that the truck consumes excessive amounts of diesel exhaust fluid ("DEF").[1] According to the vehicle's "Owner's Guide Supplement," which was provided to Mr. Beaver at the time he purchased the vehicle, "[g]enerally, the DEF tank should be filled during the oil change service interval[,]" and oil change requirements vary based upon the vehicle's use: normal use, every 7500 - 10000 miles; severe use, every 5000-7499 miles; and extreme use, every 2500-4999 miles.[2] Mr. Beaver claims that, despite "normal" use, his truck required that DEF be added, on average, every 3,000 miles. The need for additional DEF was indicated on the vehicle's instrument panel although the panel did not yet indicate that an oil change was needed. Mr. Beaver attempted to rectify the DEF consumption problem by having the vehicle serviced at various Ford dealerships, including Kidd Ford-Lincoln-Mercury, approximately thirteen times between July 2010 and January 2012.

Because he was unsatisfied with the repair attempts, on August 4, 2011, Mr. Beaver filed a Complaint in the Coffee County Chancery Court against Kidd Ford-Lincoln-Mercury and Ford Motor Company (sometimes hereinafter "Ford"). Mr. Beaver claimed problems with the vehicle's DEF system and with its tires wearing "significant[ly] and uneven[ly]," and he asserted that he had "experienced other issues with his vehicle which ha[d] contributed to the substantial impairment of it." Based upon these factual allegations, Mr. Beaver asserted claims of breach of contract, breach of warranty, and violations of the Tennessee

---

[1]According to a Ford Motor Company field service engineer who testified in this matter, DEF is used to reduce nitrogen oxides emissions.

[2]The Owner's Guide Supplement provides the following "Vehicle use examples":
Normal use = No, or limited to moderate, load/towing; Flat to moderately hilly roads; No extended idling
Severe use = Moderate to heavy load/towing; Mountainous or off-road conditions; Extended idling; Extended hot or cold operation.
Extreme use = Maximum load/towing; Extreme hot or cold operation

Lemon Law[3] and the Tennessee Consumer Protection Act.[4]

A trial was held in the matter in June 2012. In August 2012, the trial court entered an Order in which it found both that the Tennessee Lemon Law applied to Mr. Beaver's vehicle and that he was entitled to relief thereunder. Specifically, the trial court found that the vehicle suffered from the nonconformities of pulling to the right, uneven tire wear, and excessive DEF consumption. Collectively, it found, these nonconformities were "substantial" and they "substantially impair[ed] the use, value and safety of the [v]ehicle[.]" Additionally, the trial court found in favor of Mr. Beaver on his breach of warranty and breach of contract claims, but it found that relief pursuant to these causes of action was preempted by the relief provided under the Tennessee Lemon Law. The trial court rescinded the purchase contract and it ordered Ford Motor Company to pay off the balance of Mr. Beaver's loan on the vehicle. Additionally, the trial court awarded Mr. Beaver a judgment for payments made on the vehicle, for accessories added to the vehicle, and for maintenance costs expended on the vehicle, less a credit to Defendants for reasonable use of the vehicle.[5] The trial court, however, dismissed Mr. Beaver's Tennessee Consumer Protection Act claim, finding that Defendants had not engaged in deceptive or unfair practices.[6] Finally, the trial court awarded Mr. Beaver $24,120.58 for his attorney fees and expenses. Ford Motor Company timely appealed to this Court.[7]

## II. ISSUES PRESENTED

Ford Motor Company presents the following issues for review, as summarized:

1. Whether the Tennessee Lemon Law applies to Mr. Beaver's vehicle; and
2. Whether Mr. Beaver's vehicle suffered from a non-conformity which substantially impaired its value.

---

[3]Tenn. Code Ann. § 55-24-101, et seq.

[4]Tenn. Code Ann. § 47-18-101, et seq.

[5]Mr. Beaver was awarded $8,346.00 for his downpayment, $21,081.39 for payments made, $2,706.68 for accessories added, and $2,115.48 for maintenance costs, for a total of $33,821.55. In addition to this amount, Mr. Beaver was awarded payments made by him post-trial.

[6]This finding is not challenged on appeal.

[7]Defendant Kidd-Ford-Lincoln-Mercury did not pursue an appeal in this matter.

For the following reasons, we affirm the decision of the chancery court.

## III.   DISCUSSION

### A.  *Applicability of Tennessee Lemon Law*

At the outset, we must resolve a question of statutory construction regarding the vehicle weight classes to which the Tennessee Lemon Law applies.  Our Supreme Court recently discussed the principles guiding statutory interpretation:

> When interpreting a statute, courts "must ascertain and give effect to the legislative intent without restricting or expanding the statute's intended meaning."  Our task is to examine the text of the statute and, if the language is unambiguous, we simply apply the plain meaning of the words used in the statute.  As we recently observed, courts "must (1) give these words their natural and ordinary meaning, (2) consider them in the context of the entire statute, and (3) presume that the General Assembly intended to give each of these words its full effect."  Every word in a statute is presumed to have meaning and purpose.  If, after examining the text of the statute, it becomes clear the statute is ambiguous, "we may reference the broader statutory scheme, the history of the legislation, or other sources to discern its meaning." "However, these non-codified external sources cannot provide a basis for departing from clear codified statutory provisions."

*Garrison v. Bickford*, 377 S.W.3d 659, 663 (Tenn. 2012) (internal citations omitted).  Our review of statutory construction issues is *de novo* without a presumption of correctness. *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 366 (Tenn. 2012).

On appeal, the parties dispute the applicability of the Tennessee Lemon Law to Mr. Beaver's vehicle.  When first enacted in 1984, the law contained no vehicle weight requirement.  However, two years later, the General Assembly amended the law to exclude from its coverage, vehicles with a "*gross vehicle weight*" exceeding 10,000 pounds.[8]

The parties disagree as to which industry measure for weighing vehicles the legislature actually intended to utilize: curb weight (base or vehicle), gross vehicle weight, or gross vehicle weight rating.  As set forth in the Owner's Guide for Mr. Beaver's vehicle,

---

[8] **Tenn. Code Ann. § 55-24-101(4)** ("'Motor vehicle' does not include . . . vehicles over ten thousand pounds (10,000 lbs.) *gross vehicle weight*") (emphasis added).

and as further established by the evidence at trial, these industry measures are defined as follows:

**Base Curb Weight** is the weight of the vehicle including a full tank of fuel and all standard equipment. It does not include passengers, cargo, or optional equipment.

**Vehicle Curb Weight** is the weight of your new vehicle when you picked it up from your authorized dealer plus any aftermarket equipment.

**Gross Vehicle Weight** is the Vehicle Curb Weight + cargo + passengers.

**Gross Vehicle Weight Rating** is the maximum allowable weight of the fully loaded vehicle (including all options, equipment, passengers and cargo).

The relevant weights of Mr. Beaver's truck are undisputed:

Curb Weight = 7,000 lbs.[9]
Gross Vehicle Weight = fluctuated between 7,500 lbs. and 8,740 lbs.[10]
Gross Vehicle Weight Rating = 13,300 lbs.

In its August 2012 Order, the trial court found that the Tennessee Lemon Law applied to Mr. Beaver's truck because "the gross vehicle weight of Plaintiff's Vehicle [was] less than ten thousand (10,000) pounds at the time the Plaintiff purchased the vehicle." On appeal, Ford Motor Company contends that, although the legislature used the term "gross vehicle weight" in the statute, it could not have actually intended for the law's applicability to be determined by a vehicle's fluctuating gross vehicle weight. Ford contends that a vehicle should not alternate between coverage and non-coverage based upon the cargo and passengers currently carried. Instead, it asserts that coverage should be objectively determined at the time of purchase based upon the vehicle's "gross vehicle weight *rating*."

---

[9]It is unclear whether this 7,000 lb. weight includes the after-market equipment added by Mr. Beaver. In any event, such equipment would not cause the vehicle to exceed 10,000 lbs.

[10]Mr. Beaver testified that he weighed the vehicle at a recycling center and that the 8,740 pound figure included the weight of the truck, the weight of Mr. Beaver, the weight of the accessories added to the truck, and the weight of the cargo being carried, including two bags of soil. The 7,500 pound figure deducted the weight of Mr. Beaver, the accessories, and the cargo.

In contrast, Mr. Beaver argues that the legislature "clear[ly] and unambiguous[ly]" used the term "gross vehicle weight," and therefore that the term should be given its plain meaning which, according to Mr. Beaver, "is the sum total of the weight of all of the parts that comprise the vehicle." Mr. Beaver does not seem to dispute that a vehicle's "gross vehicle weight" fluctuates based upon what the vehicle is currently carrying. However, he argues that this fluctuation does not create coverage questions, as Ford Motor Company suggests, because the legislature logically intended for a vehicle's "gross vehicle weight" to be determined "at the point of purchase" when the vehicle is carrying neither passengers nor cargo.

In response, Ford Motor Company contends that adopting Mr. Beaver's interpretation reads the term "gross" out of the statute in violation of the statutory construction presumption that each word included in a statute has a meaning and a purpose. *Garrison*, 377 S.W.3d at 663. Additionally, Ford Motor Company asserts that "10,001 pounds gross vehicle weight *rating* . . . is an important and well-known line of demarcation in the industry[,]" with vehicles above this weight rating characterized as "commercial vehicles" and vehicles below this weight rating characterized as "passenger cars." Without citation, Ford Motor Company contends that the legislature "incorporated the phrase 'gross vehicle weight' to exclude the largest vehicles–those over 10,000 pounds–from coverage under the Lemon Law" to provide "certain protections for passenger vehicles, while excluding commercial vehicles from those protections."

While Ford Motor Company is correct that the 10,001 pound weight is sometimes used as a demarcation line, *see, e.g.,* Tenn. Code Ann. § 55-9-602(h) (classifying a "passenger motor vehicle, with regard to child passenger restraint systems and seat belts, as a motor vehicle with a "gross vehicle weight rating" of less than 10,000 pounds), this weight does not always establish the line between commercial and passenger vehicles. ***See, e.g., Tenn. Code Ann. § 55-50-102(12)(A)(i)*** (defining a "commercial motor vehicle," as used in the Uniform Classified and Commercial Driver License Act, as a motor vehicle with a "gross vehicle weight rating" of more than 26,000 pounds). We find no indication that the legislature intended the 10,000 pound gross vehicle weight rating to demarcate between passenger and commercial vehicles for purposes of Tennessee Lemon Law coverage. In any event, the statute lends no support to Ford's argument that the law was intended to provide protection only for consumers of *passenger* vehicles.

As stated above, where statutory text is unambiguous, we must apply the plain meaning of the words used. *Garrison*, 377 S.W.3d at 663. Although the legislature has used the term "gross vehicle weight rating" in other statutory contexts, *see, e.g.,* Tenn. Code Ann. §§ 55-9-204, 55-9-217, 55-9-405, it did not use this term to categorize the vehicles entitled to protection under the Tennessee Lemon Law. We must construe the statute without any

"forced or subtle construction which would extend or limits its meaning." ***Bryant v. Baptist Health Sys.***, 213 S.W.3d 743, 749 (Tenn. 2006) (citing *Nat'l Gas Distrib., Inc. v. State*, 804 S.W.2d 66, 67 (Tenn. 1991)). Adopting Ford Motor Company's position would do just that–it would preclude from protection not only vehicles *actually weighing* more than 10,000 pounds, but also those vehicles *capable of weighing* more than 10,000 pounds. Because the legislature clearly and unambiguously chose another industry measure–"gross vehicle weight"–to demarcate between Tennessee Lemon Law protection and non-protection, we decline to read the word "rating" into the statute.

This interpretation is consistent with a very similar case from another jurisdiction. In *Joyce v. Ford Motor Co.*, 198 Cal.App. 4th 1478, 131 Cal.Rptr.3d 548 (Cal. App. 3 Dist. 2011), the California Court of Appeals considered the applicability of the Song-Beverly Consumer Warranty Act (the "Act"),[11] California's lemon law, to the Ford F-250 truck purchased by plaintiff Joyce. The Act, which applied to "new motor vehicle[s]" defined the term, in relevant part, as follows:

> "New motor vehicle" means a new motor vehicle that is bought or used primarily for personal, family, or household purposes. "New motor vehicle" also means a new motor vehicle with a *gross vehicle weight* under 10,000 pounds that is bought or used primarily for business purposes by a person[.]

*Id.* at 556 (quoting Civ. Code, § 1793.22, subdivision (e)(2)) (emphasis added).

The *Joyce* vehicle had an invoice shipping weight of 6,787 pounds, and even after plaintiff added certain after-market accessories, the vehicle did not weigh 10,000 pounds. *Id.* at 558. In *Joyce*, Ford Motor Company did not dispute that plaintiff's vehicle actually weighed less than 10,000 pounds. Instead, as in this case, Ford argued that the phrase "gross vehicle weight" was intended to mean "gross vehicle weight rating" and therefore, that plaintiff's vehicle, which had a gross vehicle weight rating of 10,000 pounds, was not entitled to protection under the Act. *Id.* The California Court of Appeals was unpersuaded by Ford's argument, finding that the phrase "'gross vehicle weight' is clear and unambiguous. . . ." and that "the plain and ordinary meaning of 'gross vehicle weight' is the overall total amount that the vehicle weighs."[12] *Id.* at 558-59. The Court rejected Ford's assertion that "gross vehicle weight" was not a universally applied term, noting that the

---

[11]Civ. Code, §§ 1790, 1793.2, subd. (d)(2).

[12]The Court relied, in part, on the dictionary definitions of the terms "weight" and "gross": "Merriam-Webster's Collegiate Dictionary, 11th Edition, defines the word 'weight' to mean 'the amount that a thing weighs.' This dictionary also defines 'gross' to mean 'overall total exclusive of deductions.'" ***Joyce***, 131 Cal.Rptr.3d at 559 (citing Merriam-Webster's 11th Collegiate Dict. (2006) pp. 1419, col. 1; 513, col. 2).

truck's owner's manual, like the manual in the instant case, defined the terms separately, and differently, as follows:

> GVW (Gross Vehicle Weight) means the Vehicle Curb Weight + cargo + passengers.

> GVWR (Gross Vehicle Weight Rating) means the maximum allowable weight of the fully loaded vehicle (including all options, equipment, passengers and cargo).

*Id.* at 559. The Court concluded that "the term 'gross vehicle weight' is [] universally understood [and] applied in the industry. . . . And it does not mean 'gross vehicle weight rating.'" *Id.* at 560. Because it was undisputed that the plaintiff's truck actually weighed less than 10,000 pounds, the Court of Appeals concluded that the trial court had erred in granting Ford Motor Company's motion for nonsuit. *Id.* at 561.

As stated above, the actual weight of Mr. Beaver's vehicle was less than 10,001 pounds. Because his vehicle fell below the 10,001 pound threshold set forth in the Tennessee Lemon Law, we find the trial court correctly determined that Mr. Beaver's vehicle is entitled to protection thereunder.

### B. *Non-Conformity and Substantial Impairment*

Having determined that the Tennessee Lemon Law applies to Mr. Beaver's vehicle, we must now consider Ford Motor Company's argument that the trial court erred in finding that Mr. Beaver's vehicle suffered from a non-conformity which substantially impaired its value. In considering this issue, we presume the correctness of the trial court's factual findings unless the evidence preponderates against them–that is, unless the evidence supports another factual finding with greater convincing effect. **Tenn. R. App. P. 13(d) (2013)**; *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn. 2001); *Watson v. Watson,* 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citations omitted). Additionally, we accord great weight to the trial court's credibility determinations. ***Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC,*** 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

The Tennessee Lemon Law provides for the replacement or return of substantially impaired motor vehicles. The law states in relevant part:

(a) The manufacturer must replace the motor vehicle with a comparable motor vehicle or accept return of the vehicle from the consumer and refund to the consumer the full purchase price if:

(1) The nonconformity, defect or condition substantially impairs the motor vehicle; and

(2) The manufacturer, its agent or authorized dealer is unable to conform the motor vehicle to any applicable express warranty after a reasonable number of attempts.

**Tenn. Code Ann. § 55-24-103(a)**. The law further provides that "'[s]ubstantially impair' means to render a motor vehicle unreliable or unsafe for normal operation or to reduce its resale market value below the average resale value for comparable motor vehicles[.]" **Tenn. Code Ann. § 55-24-101(6)**.

Regarding non-conformity, the trial court found as follows:

This Court also finds that Plaintiff purchased a new 2011 Ford F350 diesel truck . . . from Defendants on May 19, 2010. The Vehicle was covered by a manufacturer's warranty at the time of purchase. This Court further finds that Defendants provided Plaintiff with an owner's manual and a supplement thereto at the time of his purchase of the Vehicle for the purpose of explaining the expectations for the performance and maintenance schedule of the Vehicle.

This Court also finds the testimony of Plaintiff, Robert Beaver, to be very credible. Specifically, this Court finds that Plaintiff drove, operated and used his Vehicle in the manner to which he testified. This Court finds that he only used the Vehicle to pull a trailer on one occasion. This Court finds that his explanation as to why he did not use the Vehicle to pull the trailer for which he bought the Vehicle to be credible. This Court finds that his testimony regarding the problems he experienced with the Vehicle to be credible and that his Vehicle in fact depleted its supply of diesel exhaust fluid on average of approximately every three thousand (3,000) miles. The distance which the Vehicle traveled before the diesel exhaust fluid was expended varied between as little as less than one thousand (1,000) miles and no more than just over five thousand (5,000) miles. . . .

. . . .

This Court finds that the Plaintiff's Vehicle suffered from substantial nonconformities. This Court finds that the Vehicle, pursuant to the owner's manual and its supplement provided by the Defendants to the Plaintiff, should have been able to travel seven thousand five hundred (7,500) to ten thousand (10,000) miles before requiring any servicing relative to the diesel exhaust fluid. This Court finds it is reasonable for the Plaintiff and other consumers to rely on the owner's manual for determining the performance to which the Vehicle is expected to conform. This Court finds that the Vehicle exhausted its supply of diesel exhaust fluid on average of every three thousand (3,000) miles which should only occur if the Plaintiff was operating the Vehicle in extreme manner as defined by the owner's manual and supplements. This Court specifically finds that the Plaintiff operated his Vehicle in what is described as normal vehicle use by Ford Motor Company in its owner's manual and supplements. This Court further finds credible the Plaintiff's testimony that he brought the Vehicle to Ford Motor Company authorized dealerships specifically requesting repairs for this substantial nonconformity on more than three (3) occasions and that Ford Motor Company had ample opportunity to repair the substantial nonconformity but failed to do so. Additionally, this Court finds that Plaintiff's Vehicle also suffered from nonconformities of pulling to the right and uneven tire wear. This Court finds that the pulling to the right and uneven tire wear by themselves would not be a substantial nonconformity but, when taken together with each other and with the nonconformity relative to the diesel exhaust fluid expenditure, rendered this Vehicle to have a substantial nonconformity. This Court finds that the nonconformity substantially impairs the use, value and safety of the Vehicle in that the rapid depletion of the Vehicle's diesel exhaust fluid caused the Vehicle to operate at no more than fifty-five miles per hour and then at idle only. This substantial impairment of the use of the vehicle cannot be predicted and causes safety concerns and loss of value in the vehicle.

On appeal, Ford Motor Company argues that Mr. Beaver failed to establish: (1) that the vehicle was non-conforming; and (2) that the non-conformity substantially impaired the vehicle.

1. Non-Conformity

On appeal, Ford does not challenge the trial court's finding that the vehicle "suffered from nonconformities of pulling to the right and uneven tire wear."[13] Instead, it focuses upon DEF depletion, and it argues that Mr. Beaver's own testimony is contrary to the trial court's finding that the vehicle exhausted its DEF supply, on average, every 3,000 miles. According to Ford, Mr. Beaver's testimony demonstrated only that thirty-two gallons of DEF were added to his vehicle at eight service visits over a two-year period during which the truck was driven nearly 46,000 miles. Thus, according to Ford Motor Company, DEF was exhausted every 6,000 miles–as opposed to every 3,000 miles.

Alternatively, Ford seems to argue that evidence of excessive DEF depletion, alone, is insufficient to establish a non-conformity without evidence that the vehicle's catalytic reduction system, to which DEF is added, was defective. Ford points out that Mr. Beaver presented no evidence that any of the dealerships which serviced the vehicle identified a defect within the vehicle's selective catalytic reduction system, and that Ford's own examination of the vehicle found the "[selective catalytic reduction] system is functioning as designed with no defects." Ford asserts that even if a defect existed initially, Mr. Beaver's testimony indicated that such defect may have been cured.[14] Finally, Ford argues that Mr. Beaver should have been required to present expert testimony regarding non-conformity because Mr. Beaver's "subjective belief" that the vehicle was non-conforming was insufficient to establish his claim in light of "evidence that the subject vehicle [was] working as designed."

After reviewing the evidence in this case, we disagree with Ford's assertion that Mr. Beaver offered only his "subjective belief" that the vehicle was non-conforming. The trial court specifically credited Mr. Beaver's testimony, and his testimony established that he operated the vehicle in a "normal" manner[15] such that oil changes and DEF additions should

---

[13]Ford generally phrases the issue on appeal as "Whether Beaver presented sufficient evidence to establish a 'non-conformity' that 'substantially impaired' his vehicle, as required by § 55-24-103(a) of the Tennessee Code?" However, pulling to the right and uneven tire wear are not mentioned in its brief.

[14]Curiously, Mr. Beaver's testimony cited for this assertion is as follows:
Q: Other than continuing to replace the DEF, what, if any, other action did any of the authorized dealers or Ford take to correct this issue?
A: One time when . . . I took [the vehicle] to Russell Barnett Ford I was told that they had replaced some type of parts in the DEF system, but I don't know what those parts are.

[15]The trial court's finding that Mr. Beaver operated his vehicle normally is apparently not challenged on appeal.

have been required only every 7,500 to 10,000 miles. His testimony further demonstrated that, on numerous occasions, his vehicle's instrument panel warned of the need for additional DEF although the need for an oil change was not yet indicated. Rather than lasting 7,500 miles, Mr. Beaver's vehicle warned of the need for additional DEF at the following vehicle mileages: 4,883 miles, 8,144 miles, 12,764, 13,720 miles, 19,413 miles, 23,623 miles, 26,780 miles, and 29,178 miles. These intervals between DEF warnings range from as little as 956 miles to only 5,693–not 7,500 miles.[16] The evidence presented by Mr. Beaver also established that DEF was added to his vehicle at least eleven times between July 2010 and January 2012 during which his vehicle traveled 34,814 miles, indicating an average DEF life of 3,165 miles. In sum, the evidence fully supports the trial court's factual finding that Mr. Beaver's truck "exhausted its supply of diesel exhaust fluid on average of every three thousand (3,000) miles[.]" In any event, even if Ford is correct that DEF was exhausted every 6,000 miles, this number, nonetheless, falls below the standard set forth in the Owner's Guide Supplement.[17]

We find the evidence of excessive DEF depletion is sufficient to establish a non-conformity, and we reject Ford's apparent contention that Mr. Beaver was required to uncover the defect giving rise to the non-conformity. Additionally, because the non-conformity in this case is apparent from simple mathematical calculations, we reject Ford's assertion that Mr. Beaver was required to present expert testimony regarding the non-conformity issue. *See* **Tenn. R. Evid. 702** ("If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify in the form of an opinion or otherwise."); *State v. Scott*, 275 S.W.3d 395, 411-12 (Tenn. 2009) ("Where expert testimony is merely an iteration of what would be within the [trier or fact's] common sense, the admission of such evidence does not assist, much less substantially assist, the trier of fact to understand the evidence or determine a fact at issue."). *Compare Dodd v. Chrysler Group LLC*, No. 1:11-cv-01073-JDB-egb, 2012 WL 1565640, at *6 (W.D. Tenn. 2012) (granting summary judgment to the defendant on plaintiff's Tennessee Lemon Law claim, noting that plaintiff had offered only his personal belief that jerking and rough shifting due to transmission issues substantially impaired his vehicle's use, value, and or safety, and stating that expert proof was required because these issues were "beyond the common knowledge

---

[16]The service records presented were entirely consistent with Mr. Beaver's testimony that his vehicle warned of the need for DEF after as little as 956 miles and that the longest distance it went between DEF warnings was 5,693 miles.

[17]In its reply brief, Ford Motor Company argues that the DEF addition guidelines set forth in the Owner's Guide Supplement should not be used to establish conformity or non-conformity. This issue was not properly raised in Ford's initial appellate brief, and in any event, we reject Ford's argument that its *own* vehicle manual cannot provide the DEF depletion rate standard to which the vehicle should conform.

of a layman."). The trial court's conclusion that Mr. Beaver's vehicle was non-conforming under the Tennessee Lemon Law due to pulling to the right, uneven tire wear, and excessive DEF depletion is affirmed.

## 2. Substantial Impairment

Having found Mr. Beaver's vehicle to be non-conforming, we must lastly consider whether the non-conformities "substantially impair" the vehicle–that is, whether they render it either unreliable or unsafe for normal operation, or "reduce its resale market value below the average resale value for comparable motor vehicles[.]" **Tenn. Code Ann. § 55-24-101(6)**. The trial court apparently found that, collectively, the non-conformities of pulling to the right, uneven tire wear, and excessive DEF depletion substantially impaired the vehicle's reliability, its safety, and its resale market value.[18]

On appeal, Ford Motor Company argues that the trial court erred in "deferr[ing] primarily to [Mr.] Beaver's subjective beliefs that his truck's selective catalytic reduction emissions system continued to make the vehicle unreliable or unsafe for normal operation" and that expert testimony regarding safety and reliability should have been required. Additionally, it contends that the trial court erred in finding a loss of resale value because Mr. Beaver received an offer to purchase his truck "for exactly what he thought the truck [without non-conformities] was worth."

At trial, Mr. Beaver testified that when he purchased the vehicle, a representative from Kidd Ford-Lincoln-Mercury provided him with the Owner's Guide Supplement and directed him to rely upon such "as far as maintenance of the exhaust system relative to adding DEF[.]" Specifically, he stated that the representative directed him to and highlighted a section entitled "DEF warning messages and vehicle operations" which provided:

> **WARNING:** Diesel Exhaust Fluid (DEF) must be refilled when low or replaced when contaminated or the vehicle speed will be speed limited to 55 mph (80 km/h). In these conditions, drive with caution and refill DEF immediately. If the DEF becomes empty or contaminated fluid is not replaced, the vehicle will become limited to idle speed only once stopped. In these conditions, be cautious where you stop the vehicle because you may not be able to drive long distances and will not be able to maintain highway speeds until DEF is refilled or replaced.

---

[18]The trial court found that the nonconformities "substantially impair[ed] the use, value and safety of the Vehicle."

Mr. Beaver testified that the vehicle is designed to provide an instrument panel warning when the remaining DEF life is less than 800 miles. He stated that he not only repeatedly received the warning when the vehicle's DEF should have had well over 800 miles remaining, but also that on at least two occasions, the DEF warning did not provide an accurate service indicator. For example, he testified that a 799-mile warning appeared, but by the time he reached a service dealership sixty to seventy miles away, the instrument panel indicated the need for additional DEF in only 300 miles. On another trip to South Dakota, the warning indicator "dropped from the 800 [miles] down to around 300[,]" requiring Mr. Beaver to halt his overnight drive and spend the night in his vehicle waiting for a service dealership to open.

It is unclear from the testimony presented whether, at any point, Mr. Beaver's vehicle actually began to idle or was limited to fifty-five miles per hour. This lack of evidence notwithstanding, we find Mr. Beaver's vehicle was clearly, at a minimum, unreliable. Mr. Beaver could not predict when a DEF warning would appear, and when such a warning did appear, he could not depend upon the mileage indicator to determine when DEF would be depleted. This lack of reliability was of particular concern to Mr. Beaver when he traveled, requiring him to purchase back-up DEF to avoid becoming stranded. We reject Ford's assertion that Mr. Beaver could not establish the vehicle's unreliability absent expert testimony. Based upon our findings of non-conformity and substantial impairment due to unreliability, we affirm the trial court's conclusion that Mr. Beaver was entitled to relief under the Tennessee Lemon Law. The judgment of the trial court is affirmed and all remaining issues are pretermitted.

## IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellant, Ford Motor Company, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.